IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JESSICA A. ROGERS, | ) | Case No. 5:25-cv-000172 |
| | ) | |
| Plaintiff, | ) | JUDGE PAMELA A. BARKER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Jessica Rogers ("Rogers"), seeks judicial review of the final decision of the

Commissioner of Social Security, denying her application for disability insurance benefits

("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C.

§§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Rogers raises five issues on review of the

Administrative Law Judge's ("ALJ") decision, arguing:

1.      The ALJ erred at Step 4 by failing to include the limitation in the RFC that
Plaintiff would require three absences from work in a month due to her medical
appointments.

2.      The ALJ failed to appropriately consider Plaintiff's fibromyalgia under SSR 12-
2p.

3.      The ALJ failed to appropriately consider Plaintiff's changing treatment regimen.

4.      The ALJ erred by finding Dr. Pellegrino's opinion unpersuasive, due to failing to
appropriately consider all of the factors regarding Dr. Pellegrino's opinion under
CFR §404.1520c.

5.      The ALJ improperly relied on Plaintiff's limited daily activities to support an
RFC that failed to include more restrictive mental health limitations and to
account for her work-preclusive off-task behavior.

(ECF Doc. 7, p. 1).

Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards, I recommend that the Commissioner's final decision denying Rogers' application for DIB be vacated and remanded for further consideration.

## II.      Procedural History

Rogers filed for DIB on January 5, 2022, alleging a disability onset date of July 4, 2017. (Tr. 79). She later amended her onset date by oral motion at her Administrative Hearing to January 1, 2022. (Tr. 46). The claims were denied initially and on reconsideration. (Tr. 88, 89). She then requested a hearing before an Administrative Law Judge. (Tr. 114). Rogers, represented by counsel, and a vocational expert ("VE") testified before the ALJ on November 1, 2023. (Tr. 38-78). On November 24, 2023, the ALJ issued a written decision finding Rogers not disabled. (Tr. 7-25). The Appeals Council denied her request for review on June 26, 2024, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; see 20 C.F.R. §§ 404.955, 404.981). Rogers timely filed this action on January 31, 2025. (ECF Doc. 1).

## III.     Evidence

### A.      Personal, Educational, and Vocational Evidence

Rogers  was 43 years old on the date last insured, making her a younger individual according to Agency regulations. (*See* Tr. 74). She graduated from college. (*See* Tr. 564). In the past, she worked as an insurance agent, DOT 250-257.010, SVP 6 skilled, sedentary, and as a manager/supervisor of an office, DOT 169.167-034, SVP 7 skilled, sedentary. (Tr. 23).

### B.      Relevant Medical Evidence

On August 10, 2021, after reporting that she was unable to sleep due to excruciating neck pain, Rogers underwent a cervical MRI that showed a possible annular fissure at C4-5. (Tr. 317).

Rogers underwent a surgical repair of a perforated gastric ulcer on October 6, 2021. (Tr. 312).

At a pain management appointment on November 19, 2021, a physician's assistant noted that Rogers had undergone right C5-6 and C6-7 facet joint medial block injections, and that Rogers reported 80% relief with the injections. (Tr. 409). Rogers complained of lumbar pain, worse with sitting, and was administered sacroiliac joint ("SIJ") injections. (Tr. 411).

On December 2, 2021, Rogers presented to her primary care physician, Dr. Victoria Alexander, complaining of bilateral knee pain and requested a consultation with an orthopedic surgeon. (Tr. 307). Dr. Alexander assessed Rogers with anxiety, chronic pain syndrome, chronic migraine, fibromyalgia, neck pain, pain in bilateral knees and other chronic pain, and made the referral to an orthopedic surgeon. (Tr. 310). Rogers' knees were x-rayed on January 10, 2022, but the result was negative for significant findings. (Tr. 1706-07). Rogers began physical therapy on January 11, 2022 at Western Reserve Hospital to treat bilateral knee pain, redness, and swelling that resulted in difficulty squatting and kneeling, and constant pain. (Tr. 1583). She was discharged from physical therapy on April 6, 2022. (Tr. 1563).

On January 25, 2022, Rogers was assessed with fibromyalgia, muscle spasms, lumbar and cervical radiculopathy, cervical disc degeneration, and chronic migraine without aura. (Tr. 400). She received Botox injections, which had provided 80% benefit for migraines when last administered. (*Id.*)

At a January 31, 2022 visit, Rogers was given trigger point injections ("TPI") to treat myofascial flares. (Tr. 395). Her most recent prior trigger point injections had provided 60% relief for five weeks. (*Id.*)

3

On February 24, 2022, again received SI joint injections, noting 80% improvement with previous injections. (Tr. 387). On March 1, 2022, Rogers' assessment included bilateral primary osteoarthritis of the knees, sacroiliitis, fibromyalgia, muscle spasms, chronic migraine, lumbar radiculopathy and cervical spondylosis. (Tr. 382). She was again given bilateral knee joint injections. (*Id.*) On March 14, 2022, Rogers received trigger point injections, noting 65% benefit for 5 weeks with her prior injections. (Tr. 379).

On April 15, 2022, Physician Assistant Natalie Flynn of Ohio Pain and Rehabilitation Specialists administered Rogers right cervical facet joint medial block injections, noting she had received 80% benefit when she most recently had this procedure. (Tr. 636). If significant short-term benefits were seen from this therapy, but not sustained, she was to be considered for radio frequency ablation ("RFA"). (*Id.*). Dr. Mark Pellegrino, M.D., also of Ohio Pain and Rehabilitation Specialists, provided Rogers with Botox injections, which he noted to be 80% effective in treating her migraine headaches. (Tr. 631).

PA Flynn provided TPI without complications on April 27, 2022. (Tr. 627). PA Flynn noted that Rogers displayed 16 of 18 tender points, exceeding the diagnostic threshold of 11 required for fibromyalgia. (*Id.*) Rogers again received right cervical facet joint medial block injections on May 24, 2022. (Tr. 620).

On June 10, 2022, received bilateral knee joint injections to treat knee osteoarthritis. (Tr. 617). At an appointment with Dr. Alexander on July 12, 2022, Rogers reported leg pain and swelling following air travel to Las Vegas. (Tr. 576). The swelling had improved, but then worsened again with humid weather, causing her to have problems with tripping. (*Id.*). PA Flynn administered TPI's to Rogers on June 21, 2022, noting her most recent TPI's had provided 70% relief for five weeks. (Tr. 614). She underwent bilateral lumbar transforaminal epidural steroid

injections ("TF ESI") on July 18, 2022, having achieved 80% relief with previous injections (Tr. 606), and she had Botox injections on June 26, 2022, having gained 90% benefit from her previous treatment. (Tr. 603). She had another round of lumbar TF ESI on August 9, 2022 (Tr. 599) and another round of TPI on August 30, 2022, noting greater than 70% improvement from prior TPI. (Tr. 596). On September 13, 2022, Dr. Pellegrino administered bilateral knee joint injections, recording that her last knee injections had reduced her pain by over 50% for 2.5 months. (Tr. 591).

On September 29, 2022, Rogers attended an appointment with Dr. Matthew Lutz, who assessed her with vertigo and cervicogenic headaches. (Tr. 1271). She was reporting issues with her balance and given a refill of her meclizine prescription. (*Id.*). That same day, Rogers was given bilateral SIJ injections. (Tr. 714). She then received TPI on October 12, 2022, noting 75% benefit with her most recent injections. (Tr. 710). This was followed by Botox injections on October 25, 2022, with a report that she had enjoyed a 95% decrease in her headaches with her last treatment. (Tr. 707). She underwent SIJ injections on November 1, 2022, reporting 80% reduction in low back and radicular leg pain from her most recent SIJ injections. (Tr. 700). She had right cervical facet joint medial branch injections on November 2, 2022, (Tr. 697-698), and again on November 21, 2022. (Tr. 693). On December 1, 2022, Rogers reported to Dr. Lutz that her vertigo symptoms had improved with an Epley maneuver, but she felt her hearing had diminished bilaterally, worse on the right. (Tr. 1267) She had TPI on December 13, 2022 (Tr. 691), and bilateral knee joint injections on December 27, 2022. (Tr. (688). She received lumbar TF ESI on January 16, 2023. (Tr. 681).

Rogers started a regimen of chiropractic care on January 17, 2023, and continued receiving services through September 2, 2023. (Tr. 1183-1228). On January 31, 2023, she

received Botox injections, noting 90-95% improvement and only seven headaches since her last treatment. (Tr. 1175). She underwent TPI on February 7, 2023, with 75% benefit for five weeks from the previous injections. (Tr. 1169). She had a lumbar TF ESI on February 13, 2023 (Tr. 1166-1167) and again on March 13, 2023. (Tr. 1160). She was given bilateral knee injections on March 20, 2023, noting 95% relief of her pain for 2.5 months with her prior injections. (Tr. 1155). Rogers was given TPI on April 4, 2023. (Tr. 1151).

Rogers underwent lumbar and sacral RFA on April 20, 2023. (Tr. 1144). She was given Botox on May 2, 2023, reporting only one migraine headache since her last treatment. (Tr. 1139). She again underwent a right lumbar and sacral RFA on May 16, 2023 and reported 90% sustained benefit from the RFA series. (Tr. 1135). She had TPI on May 23, 2023. (Tr. P. 1132). She had a left lumbar and sacral RFA on May 25, 2023 (Tr. 1129), with a second treatment on June 2, 2023 (Tr. 1124), and a third on June 22, 2023. (Tr. 1121). She had bilateral knee injections on June 27, 2023, reporting 80% for several months with her last injections. (Tr. 1117). She underwent a right cervical RFA on July 12, 2023 (Tr. 1114) and left lumbar facet joint medial block injections on July 20, 2023. (Tr. 1110).  She received Botox injections on August 1, 2023. (Tr. 1105).

Rogers underwent left lumbar facet joint medial block injections on August 14, 2023. (Tr. 1855). As she had 85% benefit, she had a second round of the injections on August 24, 2023 (Tr. 1858), and a third on September 11, 2023. (Tr. 1864). As she had 85% benefit, and was able to more easily perform her activities of daily living, she underwent a left lumbar RFA on September 25, 2023. (Tr. 1872). She had TPI on October 10, 2023 (Tr. 1879), and the first in a series of three Gelysen injections in her left knee on October 12, 2023. (Tr. 1872).

C.      **Medical Opinion Evidence**

1.      **State Agency Reviewers**

On July 27, 2022, state agency reviewing physician Stephen Koch, M.D., determined that Rogers was capable of lifting and/or carrying 20 pounds occasionally and 10 pounds frequently, and that she could walk, stand or sit for six hours in an eight-hour workday, consistent with the light exertional level. (Tr. 85). Dr. Koch restricted Rogers to frequent climbing of ramps or stairs, but never climbing ladders, ropes or scaffolds. (*Id.*). He determined Rogers was able to frequently stoop, and occasionally kneel, crouch or crawl, but could not be exposed to unprotected heights. (Tr. 85-86). At the reconsideration level on April 12, 2023, W. Scott Bolz, M.D., confirmed Dr. Koch's opinion, and determined his findings were consistent with and supported by the current documentation. (Tr. 96-97).

On July 27, 2022, state agency reviewing psychologist Karla Delcour, Ph.D., found that Rogers had only mild limitation limitations in interacting with others; in concentration, persistence and pace; and no limitations in understanding/remembering/carrying out instructions and adaptation. (Tr. 78). Dr. Delcour determined that Rogers' psychiatric condition was not severe. (*Id.*). At the reconsideration level on April 12, 2013, state agency reviewing psychologist Kristen Haskins, Psy.D. opined that Rogers had moderate limitation in understanding, remembering and carrying out instructions; concentration, persistence and pace; and adaptation, and no limitations in interacting with others. (Tr. 94). Dr. Haskins found that Rogers was moderately limited in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration; to complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without

an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting. (Tr. 97-98).

        2.    **Consultative Examiners**

On July 7, 2022, Rogers attended a mental health consultative examination with Joshua Magleby, Ph.D. (Tr. 563-69). Rogers alleged that she unable to process information needed for work, including her past job, and she feels she would miss more than the 30-50 days of work that she missed at her prior job. (Tr. 563). Rogers reported she was a college graduate and that she has an insurance license. (Tr. 564). She reported no mental health treatment history and described her mood as generally "happy". (*Id.*) She reported being uncomfortable around others since Covid and noted problems with concentration since she had surgery to save her hearing in 2017. (*Id.*). She lived with her husband and 13-year-old daughter and was capable of performing her activities of daily living. (*Id.*). Dr. Magleby estimated her intelligence to be low average to borderline and diagnosed her with an unspecified neurocognitive disorder. (Tr. 566-67). Dr. Magleby opined that Rogers' ability to understand, remember, and carry out instructions appeared to be fairly average for age expectation. (Tr. 568). He found her ability to perform multi-step tasks was at least somewhat impaired, and that her social interaction has been without significant incident but with "perhaps slight to mild discomfort". (*Id.*). He believed her ability to withstand the mental stress and pressure of day-to-day work activity to be adequate. (*Id.*).

Rogers attended a second mental health consultative examination with Sudhir Dubey, Psy.D. on March 29, 2023. (Tr. 717-29). She again indicated her mood was generally good and that she was capable of performing her activities of daily living. (Tr. 718). She took a Wechsler Adult Intelligence Scale – 4th Edition test that revealed a full scale IQ score of 86, which is in the low average range, and a Wechsler Memory Scale – 4th Edition test that showed memory scores

ranging from borderline to average. (Tr. 720). Dr. Dubey confirmed Dr. Magleby's diagnosis of an unspecified neurocognitive disorder. (Tr. 721). He opined that Rogers intellectual function was in the low average range but caused her no functional issues. (Tr. 722). He found that she would have difficulty performing multi-step tasks due to cognitive and memory issues and would require supervision to complete them. (Tr. 722-23). She would not have significant difficulties in dealing with supervision or co-workers, but she would have some difficulty adapting to work pressures which could lead to frustration for her, her supervisors or her coworkers. (Tr. 723).

3.      **Treating Source Opinions**

On September 20, 2022, Dr. Pellegrino submitted a Medical Opinion Re: Ability to Do Work-Related Activities (Physical). (Tr. 643-45). He diagnosed her with fibromyalgia; sacroiliitis; chronic intolerable migraines; cervical spondylosis; lumbar radiculopathy; and bilateral knee osteoarthritis. (Tr. 643). He opined she could frequently lift or carry less than 10 pounds, sit for 6 hours and stand/walk for less than 2 hours during an 8-hour day; that she could stand 15 minutes or sit 10 minutes before changing positions; that she needed to walk around for 5 minutes every 50 minutes; that she required the ability to alternate between sitting and standing at will; that she would need to lie down at least once per work shift; that she could frequently handle/finger/feel, but could never push/pull; that she could occasionally twist, stoop, crouch, reach or climb stairs or ladders; and that she needed to avoid concentrated exposure to noise and hazards and have no exposure to extreme temperatures, wetness, humidity or pulmonary irritants. (Tr. 644-45). He determined she would be absent from work more than 3 times a month and be off task more than 15% of the workday. (Tr. 645).

On October 7, 2022, Dr. Alexander completed a Dizziness Residual Functional Capacity Questionnaire. (Tr. 668-70). Dr. Alexander diagnosed Rogers with dizziness, chronic otitis and

9

fibromyalgia. (Tr. 668). Dr. Alexander opined Rogers would have dizziness episodes once weekly or two to three times monthly. (*Id.*) Dr. Alexander indicated that the dizziness could be brought on by exertion, and that it caused nausea/vomiting, mood changes, fatigue, malaise, photosensitivity and hot flashes. (*Id.*). Dizziness interfered significantly with her ability to complete activities of daily living, and her symptoms were helped "a little" with meclizine. (Tr. 669). Dr. Alexander opined that Rogers was unable to work at heights, work with power machines, operate a motor vehicle or take a bus alone. (*Id.*) She was unable to work until dizziness resolves and incapable of even low stress jobs. (*Id.*).

Dr. Lutz also completed a Dizziness Residual Functional Capacity Questionnaire on October 12, 2022. (Tr. 671-73). Dr. Lutz diagnosed vertigo, noting one episode week and two to three per month. (Tr. 671). He found that exertion could precipitate dizziness, and the dizziness caused symptoms including nausea/vomiting, mood changes, malaise, photosensitivity, fatigue and hot flashes. (*Id.*). She was unable to perform activities of daily living during vertigo episodes and found some relief from meclizine. (Tr. 672). Dr. Lutz determined that Rogers was unable to work at heights, work with power machines, operate a motor vehicle or take a bus alone. (*Id.*). She would need unscheduled breaks during her workday and was incapable of even low stress jobs. (*Id.*) She would be absent from work about three days per month. (Tr. 673).

On October 21, 2022, Dr. Alexander completed a Medical Opinion Re: Ability to Do Work-Related Activity. (Tr. 675-77). She diagnosed Rogers with fibromyalgia/neuropathy, chronic fatigue and chronic migraine. (Tr. 675). She opined that Rogers could frequently lift less than ten pounds and stand, walk or sit less than two hours during an eight-hour workday. (*Id.*) Dr. Alexander determined that Rogers needs to change positions every five minutes (at will); that she will need to lie down at unpredictable intervals during a work shift; that during a

10

fibromyalgia flare-up she is unable to twist, stoop, crouch, climb stairs or ladders, reach, handle, finger, feel or push/pull. (Tr. 676). Dr. Alexander found Rogers will need to avoid even moderate exposure to noise and pulmonary irritants, and avoid all exposure to extreme temperatures, wetness, humidity and hazards. (Tr. 677). She found Rogers would be absent more than 3times per month and off-task more than 15% of the workday. (*Id.*).

> ### D.    Administrative Hearing Evidence

On November 1, 2023, Rogers testified before the ALJ that she was not allowed to drive "when her vertigo is going off". (Tr. 47). She is a college graduate with an insurance license, but she is not currently working. (Tr. 48). She testified that she was able to walk her two dogs, and complete some housework, including laundry. (Tr. 53). She used to pay the family bills prior to 2017, butstopped after her surgeries. (Tr. 53). She can shop in stores, although she uses motorized scooters about 85% of the time. (Tr. 53-54). While she can carry a gallon of milk into the house, she is unable to lift a big case of pop or a bag of dog food. (Tr. 54).

Rogers indicated she is not allowed to walk for 15-20 days after she undergoes a radio frequency ablation, but otherwise she is capable of walking around the block. (Tr. 55). She is unable to sit for more than five to ten minutes at a time. (*Id.*). If she stands too long, she feels stabbing pain in her back and pain in her knees, and her knees will swell. (Tr. 55-56). She will do physical therapy exercises at home for 15-20 minutes when she feels up to it. (Tr. 57). She wears a knee brace that is like a compression sleeve and a back brace. (Tr. 58). She is no longer able to use NSAIDS due to her gastroenterology issues. (*Id.*). She takes meclizine as needed for her vertigo and Phenergan to treat nausea. (Tr. 59). She also receives Botox injections every three months to treat her migraines. (Tr. 60).

11

Rogers testified that she does find some relief from pain with her knee brace, and that it helps her to take frequent breaks from her activities. (Tr. 61). She will experience vertigo symptoms if she bends down, and that may trigger a migraine. (*Id.*). She has found vestibular therapy to be helpful on a temporary basis. (Tr. 61-62).

Under questioning by her attorney, Rogers reported that when she has dizziness episodes she is unable to get out of bed or do anything at all. (Tr. 62). She has appointments with her allergist about every six to eight weeks, with her eye surgeon every six months, with her primary care doctor 10-15 times per year, with her gastroenterologist once a year, with her dermatologist three to eight times annually, and several appointments per month with her pain management doctors. (Tr. 63-64). She is able to stand 15-25 minutes at a time while she is cooking. (Tr. 65). Both her daughter and her husband help her maintain the house, and her husband will sometimes have to come home from work to assist her. (Tr. 65-66). She uses a shower seat and sits in a recliner so she can elevate her legs. (Tr. 66). She only sleeps for an hour at night mostly due to pain. (Tr. 67).

Once Rogers concluded her testimony, Vocational Expert ("VE") Lynn Smith testified. Smith classified Rogers' past work to include insurance agent, DOT #250.257-010, light exertion,  SVP 6, and manager/supervisor of an office, DOT #169.1670-034, sedentary exertion, performed at light, SVP 7. (Tr. 70-71).

For her first hypothetical, the ALJ asked the VE to consider an individual of the same age, education and work history as Rogers, who is able to perform light work except they can frequently climb ramps or stairs and stoop, occasionally kneel, crouch or crawl, and never climb ladders, ropes, or scaffolds. They must avoid all hazards as defined in the regulations. They can understand, remember and carry out detailed but not complex tasks and can perform routine

tasks that do not require specific production rate like assembly work or work requiring specific hourly quotas. (Tr. 71). The VE opined that such an individual could perform both of Rogers' past jobs. (Tr. 72). Further, this individual could also perform other jobs including mail clerk, DOT #209.687-026, light exertion, SVP 2, with 20,000 jobs in the national economy; sales clerk, DOT #299.677-010, light, SVP 2, with 36,000 jobs in the national economy; and, cashier, DOT #211.462-010, light, SVP 2, with 150,000 jobs in the national economy. (*Id.*).

For her second hypothetical the ALJ asked the VE to consider an individual capable of performing light work but limited to occasional climbing of ramps and stairs, kneeling, crouching, stooping or crawling. The individual could never climb ladders, ropes or scaffolds, and must avoid all hazards as defined in the regulations. This individual can understand, remember and carry out simple instructions and can perform routine tasks that do not require a specific production rate, like assembly line or work requiring specific hourly quotas. (Tr. 72-73). The VE opined that this individual could not perform Rogers' past relevant work, but could perform the three jobs cited with the previous hypothetical. (Tr. 73).

For her third hypothetical the ALJ asked the VE to consider an individual capable of performing work at the sedentary exertional level, but otherwise subject to all of the same limitations from the second hypothetical. (*Id.*) The VE opined that thus individual could perform the jobs of order clerk, DOT #209.567-014, sedentary, SVP 2, with 7,000 jobs in the national economy; phone quotation clerk, DOT #237.367-046, sedentary, SVP 2, with 35,000 jobs in the national economy; and charge account clerk, DOT #205.367-014, sedentary, SVP 2, with 11,000 jobs in the national economy. (Tr. 74). The VE further opined that an individual could maintain a job if they are off task no more than 10% of the work day and are absent no more than once monthly. (*Id.*)

13

IV.     **The ALJ's Decision**

In her decision dated November 24, 2023, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through June 30, 2027.

2.      The claimant has not engaged in substantial gainful activity since January 1, 2022, the amended alleged onset date (20 CFR 404.1571 *et seq.*)

3.      The claimant has the following severe impairments: fibromyalgia, neuropathy, chronic fatigue, unspecified neurocognitive disorder, osteoarthritis in knees, spondyloses, dizziness/vertigo, tinnitus, insomnia, migraines. (20 CFR 404.1520(c)).

4.      The claimant's medically determinable mental impairment of anxiety does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore not severe.

5.      Based on her impairment of unspecified neurocognitive disorder, the undersigned has considered the broad functional areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria.

6.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

7.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(a) except she can frequently climb ramps and stairs and frequently stoop; can occasionally kneel, crouch, and crawl; can never climb ladders, ropes or scaffolds; and must avoid all exposure to all hazards as defined in the regulations. She can understand, remember and carry out detailed but not complex instructions, and can perform routine tasks that do not require a specific production rate like assembly line work or work requiring specific hourly quotas.

8.      The claimant is capable of performing past relevant work as an insurance agent and office manager. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. (20 CFR 404.1565).

14

9.    The claimant has not been under a disability, as defined in the Social Security Act, since January 1, 2022, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 12-24).

## V.    Law and Analysis

### A.    Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.    whether the claimant is engaged in substantial gainful activity;

2.    if not, whether the claimant has a severe impairment or combination of impairments;

3.    if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.    if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.    if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

---

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.*  Generally, these regulations are duplicates and establish the same analytical framework.  For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

### B.      Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by

substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g);

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial

evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148,

1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'"  *Id.*, quoting *Consolidated Edison Co. v. NLRB*,

305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's

position, the Commissioner's decision cannot be overturned "so long as substantial evidence also

supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477

(6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-

weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the

Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d

at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of

choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535,

545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that

decision when the Commissioner failed to apply proper legal standards, unless the legal error

was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision

. . . will not be upheld [when] the SSA fails to follow its own regulations and that error

prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v.*

*Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review

decisions of administrative agencies for harmless error."). Furthermore, this Court will not

uphold a decision when the Commissioner's reasoning does "not build an accurate and logical

bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D.

Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing

court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the

court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-

13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

**VI.    Discussion**

Rogers brings five issues for this Court's review:

1.    Whether the ALJ erred at Step 4 by failing to include the limitation in the RFC that Plaintiff would require three absences from work in a month due to her medical appointments?

2.    Whether the ALJ failed to appropriately consider Plaintiff's fibromyalgia under SSR 12-2p?

3.    Whether the ALJ failed to appropriately consider Plaintiff's changing treatment regimen?

4.    Whether the ALJ erred by finding Dr. Pellegrino's opinion unpersuasive, due to failing to appropriately consider all of the factors regarding Dr. Pellegrino's opinion under CFR §404.1520c?

5.    Whether the ALJ improperly relied on Plaintiff's limited daily activities to support an RFC that failed to include more restrictive mental health limitations and to account for her work-preclusive off-task behavior?

(ECF Doc. 7, p. 1). The Commissioner responded by combining Issues One, Two, Three and

Five into a singular issue, essentially asserting that each of these arguments attacked the ALJ's

determination of Rogers' RFC. I concur with this framing and will similarly address those issues

under one heading while also responding to Issue Four separately. (ECF Doc. 8, p. 1).

17

A.    **The ALJ erred in evaluating Dr. Pellegrino's opinion by failing to fully
consider the factor of consistency as required under C.F.R. §§404.1520c.**

Rogers argues in her fourth issue that the ALJ erred in finding Dr. Pellegrino's opinion

unpersuasive in that the ALJ did not properly consider the factors of supportability and

consistency as required by CFR §404.1520c. (ECF Doc. 7, at pp. 18-19). Rogers contends that

the ALJ's assessment of the opinion failed to acknowledge the nature of fibromyalgia which

"often lacks objective findings and presents with fluctuating symptoms." (*Id.*) at p. 19). Rogers

suggests that her subjective complaints and Dr. Pellegrino's objective findings supported his

opinion and were consistent with the notes of other providers. (*Id.*). Further, Rogers argues, Dr.

Pellegrino's opinion is consistent with other opinions in the record. (*Id.*). The ALJ, in Rogers'

view, cites examples in Dr. Pellegrino's treatment notes that suggest temporary relief from

injections, but does not account for return of the underlying symptoms after the effects of the

injections wane. (*Id.* at pp. 20-21). Finally, Rogers claims that the ALJ failed to consider the

longitudinal relationship Dr. Pellegrino has maintained with Rogers since he first began treating

her in 2017. (*Id.* at pp. 21-22).

The Commissioner responds by arguing that substantial evidence supported the ALJ's

determination that Dr. Pellegrino's opinion was unpersuasive. (ECF Doc. 8, at p. 11). The

Commissioner points to several examples in the record, both from Dr. Pellegrino's own notes

and those of other treating sources, where Rogers reported some degree of relief from the

injections she received leading to reduced symptoms. (*Id.* at pp. 11-13). The ALJ also noted that

Dr. Pellegrino's opinion concerning absenteeism were not supported by the record which shows

that Rogers "rarely missed any appointments in his office. "(*Id.* at p. 12). According to the

Commissioner, Dr. Pellegrino's opinion concerning absenteeism was inconsistent with the

persuasive findings of the state agency reviewing physicians who offered no such limitations.

18

(*Id.* at p. 13). The Commissioner concludes by claiming that Rogers' argument is simply an invitation for this Court to reweigh the evidence in her favor, an exercise beyond its purview. (*Id.* at pp. 13-14).

The ALJ must "articulate how [he] considered the medical opinions" and "how persuasive [he] find(s) all of the medical opinions." 20 C.F.R § 416.920c; *Gamble v. Berryhill*, No. 5:16-CV-2869, 2018 WL 1080916 at 5 (N.D Ohio, Feb. 28, 2018). Factors to be considered include: (1) Supportability; (2) Consistency; (3) Relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) Specialization; and (5) other factors. 20 C.F.R. § 416.920c. Supportability and consistency are considered the two most important factors; therefore, the regulations dictate that the ALJ "will explain" how the supportability and consistency factors were considered. 20 C.F.R. § 416.920c. The factor of supportability suggests that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support their medical opinion or prior administrative medical findings, the more persuasive the medical opinions or prior administrative medical findings will be. 20 C.F.R. § 416.920c(1). The factor of consistency suggests the more consistent a medical opinion or prior administrative finding is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion or prior administrative medical finding will be. 20 C.F.R.§  416.920c(2).

Here, the ALJ provided a robust discussion of how Dr. Pellegrino's treatment notes support her finding that his opinion is unpersuasive. Specifically, the ALJ points to a September 2022 note where Dr. Pellegrino recorded that Rogers' prior injections had decreased her pain by 50% for 2.5 months, "enabling her to walk, climb stairs and function better." (Tr. 25). The ALJ

further noted that Dr. Pellegrino also wrote that Rogers' gait was normal and pain to her lower spine was mild on August 1, 2023. (*Id.*). The ALJ notes that despite his opinion that Rogers requires the ability to change position every ten minutes, Dr. Pellegrino's notes provide no evidence in support of that limitation, and further, despite his claim that she will be absent from work more than three times monthly, she rarely missed appointments in his office. (*Id.*). While it may be fair to question some of the reasoning above, this degree of analysis satisfies the requirement to articulate how she considered the factor of supportability.

Where the decision suffers, however, is in its failure to meaningfully discuss the factor of consistency. Specifically, in addition to the opinions of state agency reviewing physicians and psychologists, and mental health consultative examiners, the record includes the opinions of two other providers who had longitudinal treating relationships with Rogers. Dr. Victoria Alexander, Rogers' primary care physician, completed both a Dizziness Residual Functional Capacity Questionnaire (Tr. 668-70) dated October 7. 2022, and a Medical Opinion Re: Ability to Do Work-Related Activities (Physical), (Tr. 675-77), dated October 21, 2022. Additionally, Dr. Matthew Lutz, Rogers' ENT, completed a Dizziness Residual Functional Capacity Questionnaire dated October 12, 2022. (Tr. 671-73). While the ALJ did evaluate the opinions of Drs. Alexander and Lutz, and deemed all three opinions to be unpersuasive, (Tr.20), the ALJ failed to provide any discussion of consistency between these opinions, despite the relative similarities that exist amongst the opinions offered by her various treating physicians. It is only with regard to dizziness that the ALJ provides any evaluation of the three doctors' opinions together, but even so, the ALJ describes her evaluation in terms of supportability. (*See* Tr. 19 (stating that "the evidence does not fully support" Rogers' complaints of dizziness upon review of Drs. Lutz, Alexander, and Pellegrino's examination notes)).  Furthermore, that minimal articulation of the

supportability of dizziness symptoms gives short shrift to the consistency Dr. Pellegrino's opinion shares with Dr. Alexander's relative to postural and manipulative limitations, and Drs. Alexander and Lutz with regard to restrictions on exposure to hazards, absenteeism and attentiveness to tasks.

Further, although the Commissioner notes his own finding of inconsistency between Dr. Pellegrino's opinion with regard to absenteeism and the state agency reviewing physicians' opinions that are silent on absenteeism, this is not articulated in the ALJ's decision. (ECF Doc. 8 at p.13). The ALJ only mentions finding the state agency reviewing physicians' opinions persuasive due to the findings of a single MRI and provides no discussion of the consistency those opinions may share with those of Rogers' treating sources. (Tr. 23).

The Commissioner cites examples interspersed in the record where Rogers' physicians noted the relative effectiveness of various injections she received in order to demonstrate some inconsistency between Dr. Pellegrino's opinion and the record as a whole. (ECF. Doc 8, at p. 13). The Commissioner also notes various examinations where Rogers denied certain symptoms as further evidence of this inconsistency. (*Id.*). These points, however, still do not address the ALJ's failure to evaluate the similarities between the opinions of Rogers' treating sources in her decision. This Court is barred from accepting the type of post-hoc rationalization the Commissioner sets forth, as judicial review of agency action is limited to the reasoning employed by the agency and should not take into account its position in litigation. *SEC v. Cherney Corp.*, 332 U.S. 194 (1947). The ALJ's silence leaves me unable to grasp how the ALJ considered the consistency of Dr. Pellegrino's opinion.

Accordingly, given the lack of articulation regarding the consistency of Dr. Pellegrino's opinion with other expert opinions in the record, I must recommend remand on this basis.

**B.      The ALJ's RFC determination was only partially supported by substantial evidence.**

Rogers next asserts, for various reasons, that the ALJ's decision was deficient in that there was not substantial evidence that supported her findings. (ECF Doc. 7, p. 1). Specifically, Rogers contends that the ALJ failed to include a limitation in her RFC allowing for three absences per month due to her medical appointments, (*id.*); that the ALJ failed to consider her condition of fibromyalgia in a manner consistent with SSR 12-2p, (*id.*); that the ALJ failed to properly consider Rogers' changing treatment regimen, (*id.*); and, that the ALJ relied on Rogers' limited daily activities to support an RFC that failed to consider more restrictive mental health limitations and to account for her off-task behavior. (*id.*).

Pertaining to fibromyalgia, Rogers contends the ALJ failed to properly consider the waxing and waning nature of fibromyalgia when addressing this impairment. (*Id.* at p. 14). Additionally, the ALJ failed to account for Rogers' subjective pain and fatigue associated with fibromyalgia when crafting an appropriate RFC. (*Id.* at p. 16). But for these errors of omission, Rogers argues, VE testimony would have compelled a finding of disability. (*Id.*).

Rogers also contends that the ALJ erred in failing to consider her changing treating regimen. (*Id.*). The ALJ concluded that Rogers obtained relief from her injections despite evidence in the record showing the need for ongoing or adjusted treatment regimens. (*Id*. at p. 17). Rogers asserts that "this oversight demonstrates that the ALJ failed to consider several factors required under 20 C.F.R. § 404.1529(c)(3), such as the frequency and intensity of Plaintiff's pain and other symptoms, as well as the type, dosage, effectiveness and side effects of the medications she used." (*Id.*).

Finally, Rogers argues that the ALJ overstated the relevance of her daily activities in discounting the consultative examiner's opinion that she was limited to simple tasks. (*Id.* at p.

22). Rogers suggests that relying on activities of daily living in this manner reflects a "flawed understanding of how limited daily activities translate to the demands of full-time competitive work." (*Id.*). Here, Rogers contends, her conditions frequently cause diffuse pain, cognitive and physical fatigue and functional, "even when objective or testing is unremarkable." (*Id.* at p. 24). In Rogers' view, this conflicts with SSR 16-3p which prohibits evaluating a claimant's symptoms based on selective activity references. (*Id.*).

In response, the Commissioner argues that there is substantial evidence supporting the ALJ's RFC findings. (ECF Doc. 8, p. 8). In the Commissioner's view, the ALJ properly considered the relevant objective medical evidence, medical opinion evidence, prior administrative findings and other evidence in determining the RFC. (*Id.*). The Commissioner notes that the ALJ cited several instances in the record where examinations revealed no more than marginal findings, as well as several examples of Rogers' noting substantial relief from treatments that that included pain and Botox injections. (*Id.* at pp. 8-9). Further. Rogers' activities of daily living supported the ALJ's determination that she was not disabled, and the Commissioner contends that Rogers' argument suggesting the ALJ erred in considered these activities amounts to a request to consider the evidence *de novo*, which is not appropriate. (*Id.* at p. 10). Finally, the Commissioner argues that the ALJ considered the prior administrative medical findings, found them persuasive and adopted their findings, showing that the RFC determination was supported by substantial evidence.

My review of the ALJ's decision is "limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards." *Napier v. Comm'r of Soc. Sec.* 127 F.4th 1000, 1004 (6th Cir. 2025), citing *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is "more than a scintilla of evidence but less than

a preponderance," (*Id.*); it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148 (2019). As long as the ALJ's findings are supported by substantial evidence, we may not second-guess them, even if substantial evidence would support the opposite conclusion. *Ulman v. Comm'r of Soc. Sec.*, 693, F.3d 709, 714 (6th Cir. 2012).

Generally speaking, the ALJ's RFC determination provides a thorough review of the available evidence considered when forming the RFC. In the present case, the ALJ's decision identified several severe medical impairments, including fibromyalgia, neuropathy, chronic fatigue, unspecified neurocognitive disorder, osteoarthritis in knees, spondyloses, dizziness/vertigo, tinnitus, insomnia, and migraines. (Tr. 12). She further named non-severe impairments of gastrointestinal/IBS and anxiety, and noted that "despite the non-severe findings, [the ALJ] considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity." (Tr. 13). The ALJ then proceeded to address the evidence of each condition and symptom that advised her RFC determination.

In arriving at a light residual functional capacity, the ALJ considered all evidence pertaining to restrictions on walking and standing arising from back and knee issues and owing to pain from her fibromyalgia. (Tr. 17). Here the ALJ discussed in detail the relative effectiveness of her trigger point, knee, bilateral SI joint, and Botox injections (*Id.*), and noted that in various office visits her treating sources noted "full flexion range, mildly decreased extension range and full range of motion" and that her "strength was normal in all muscle groups and straight leg raise was negative." (*Id.*). Treating notes further recorded Rogers' denying neck pain, and noted that a November 10, 2020 EMG of her upper extremities was unremarkable.

24

Although a May, 2019 EMG showed chronic bilateral S1 radiculopathy, the ALJ noted that the record showed Rogers was still able to live an active lifestyle, participating in "yoga, Pilates, walking and swimming". (*Id.*). While diffuse tenderness in her knees was reported in some examinations, it did not reduce her range of motion or cause edema. (*Id.*). The ALJ recognized reports of severe SI joint tenderness and an antalgic gait with heel and toe and walking, but she also noted continued reports of negative straight leg raises and normal gait. Accordingly, the RFC provided restrictions to occasional kneeling, crouching and crawling in the RFC. (*Id.*). The ALJ considered a treatment note by Dr. Pellegrino in September 2022, where Rogers noted her ability to walk, climb stairs and function better, but the ALJ still restricted Rogers to frequent climbing of ramps and stairs, and no ladders, ropes or scaffolds. (Tr. 18). The ALJ noted continuing positive responses to injections throughout 2023 and noted that at an appointment in August 2023, her gait was normal and her lower spine pain was mild. (*Id.*)

The ALJ also articulated her consideration of vertigo and dizziness in crafting the RFC. (Tr. 18-19). She noted several visits to both Dr. Alexander and Dr. Lutz where there was no mention of dizziness, and notations of "normal coordination without signs or symptoms of dizziness." (Tr. 18). Even where there were complaints of dizziness, such as at a November 8, 2022, appointment with Dr. Alexander, the physical examination was "unremarkable," and medications were provided to address the issue. (Tr. 18-19). Nonetheless the ALJ accommodated this concern by restricting Rogers from all exposure to hazards as defined in the regulations. (Tr. 15). The ALJ also properly considered Rogers' mental health in determining her RFC, noting no more than mild limitations in any functional area. (Tr. 13). The ALJ specifically mentioned her independence in managing her health care and making online purchases and her ability to supervise and maintain good relationships with employees as evidence of her ability to function

despite any mental health issues. (*Id.*). The ALJ also noted that Rogers described her own mood as happy, and she was able to perform most activities of daily living. (*Id.*).

Given the above review, and in other circumstances, the RFC determination would appear to be clearly articulated and supported by substantial evidence. However, my recommendation as to the ALJ's consideration of medical opinion evidence, above, warrants remand on this issue. Determining whether the ALJ applied the correct legal analysis may result in reversal even if the ALJ's decision is otherwise supported by substantial evidence. *See Rabbers*, 582 F.3d at 651. "[A] decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen*, 478 F.3d at 746.  Because the ALJ did not follow the Administration's regulations and articulate her consideration of the consistency of medical opinion evidence at the RFC stage, this flaw likewise becomes fatal to my review of whether substantial evidence supports the ALJ's RFC determination.

This issue becomes apparent where the ALJ discusses the issue of Rogers' treatment regimen requiring numerous appointments that might cause work-preclusive absenteeism. (Tr. 16). The ALJ accounted for the appointments required annually with Rogers' allergist, her ophthalmologist, her gastroenterologist and her dermatologist, and determined that their frequency and urgency were not work preclusive. (*Id.*). The ALJ also considered the frequency of Rogers' pain management appointments, and assessed these to not be work-preclusive, noting that she had maintained a similar treatment protocol when working full time in 2017, and that nothing about these appointments precluded immediately returning to work. (Tr. 16-17).

However, Rogers argues that the ALJ failed to properly account for the opinions of Dr. Pellegrino, Dr. Alexander, and Dr. Lutz when considering the issue of absenteeism. (ECF Doc. 8, p. 13). Rogers further argues that the ALJ erred in noting that she was able to sustain work in 2017 while maintaining a similar schedule of medical appointments that she Rogers argues would be disabling now. (*Id.* at p. 12). Rogers contends this reliance of past treatment is inappropriate, as she received accommodation from her previous employer to allow her to attend these appointments. (*Id.*). She also required many accommodations in order to work and was still regularly absent. (*Id.* at pp. 12-13).

I must agree with Rogers – where the ALJ did not properly articulate her consideration of Drs. Pellegrino, Alexander, and Lutz's opinions, and where those opinions may affect considerations regarding absenteeism and the resulting RFC, I cannot determine whether substantial evidence supports the RFC as a whole. I therefore recommend remand for consideration of the RFC in light of the ALJ's renewed consideration of Rogers' treating physician opinion evidence.

**VII.    Recommendation**

Because the ALJ failed to apply proper legal standards in evaluating the opinion of Dr. Pellegrino, I recommend that the Commissioner's final decision denying Rogers' application for disability insurance be vacated and that Rogers' case be remanded for further consideration of Dr. Pellegrino's opinion, as well as reconsidering the RFC in light of the newly articulated opinion evidence.

Dated: August 26, 2025

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS

### **Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\*\*\*

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)